**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

FEB - 9 2016

CLERK, U.S. DISTRICT COURT
by _____
Deputy

| | | |
|---|---|---|
| OPEN SOURCE GROUP, LLC, | § | |
|     Plaintiff, | § | |
| v. | § | No. 3:15-CV-1945-O |
| SAAD PATEL, | § | |
|     Defendant. | § | |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>
<u>**OF THE UNITED STATES MAGISTRATE JUDGE**</u>

Before the Court are Saad Patel's ("Defendant") (1) Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2), Alternative Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6), and Alternative Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1) [ECF No. 10] ("Motion to Dismiss Complaint"); and (2) Motion to Dismiss Plaintiff's First Amended Complaint for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2), for Failure to State a Claim Pursuant to Rule 12(b)(6), and for Lack of Subject Matter Jurisdiction Pursuant to Rule 12(b)(1) [ECF No. 16] ("Motion to Dismiss Amended Complaint"). Subsequent to the filing of Defendant's Motion to Dismiss Complaint, Open Source Group, LLC ("Plaintiff") filed its First Amended Complaint [ECF No. 15]. Therefore, the undersigned recommends that the District Court **DENY as moot** Defendant's Motion to Dismiss Complaint [ECF No. 10]. Furthermore, for the following reasons, the undersigned recommends that the District Court **GRANT** Defendant's Motion to Dismiss Amended Complaint [ECF No. 16].

**BACKGROUND**

Plaintiff brings this action alleging the following claims against Defendant: Count I: Cybersquatting; Count II: Conversion; Count III: Tortious Interference with Contract and Business Relationships; Count IV: Breach of Fiduciary Duty of Loyalty and Care; Count V: Federal Mark

Infringement; Count VI: False Designations of Origin, False Descriptions, False Representations, and Unfair Competition; Count VII: Common Law Trademark Infringement; and Count VIII: Common Law Unfair Competition. *See* Am. Compl. [ECF No. 15 at 8-14]. This lawsuit is related to a lawsuit previously filed by Plaintiff on September 16, 2013 in *Open Source Group, LLC v. Patel*, No. 3:13-CV-3755-O ("Prior Lawsuit"). Plaintiff contends that its former attorney in the Prior Lawsuit failed to plead facts in a manner that fully articulated Defendant's connections to Texas, and that Judge O'Connor dismissed without prejudice the Prior Lawsuit for lack of personal jurisdiction, because personal jurisdiction was founded upon its prior counsel's erroneous representations regarding the presence of a website and did not provide sufficient facts to support personal jurisdiction on another basis. *See* Pl.'s Resp. [ECF No. 21 at 6-7]; Order [ECF No. 65 at 9; No. 3:13-CV-3755-O].

In the First Amended Complaint, Plaintiff explains that it is a company that re-sells enterprise-level software and provides training and consulting services for the use of enterprise-level software to clients such as online retail stores, credit card companies, and financial institutions. *See* Am. Compl. [ECF No. 15 at 2]. Plaintiff states that Defendant, Defendant's spouse, Quddsia Siddiqui ("Siddiqui"), Farhan Hussain ("Hussain"), and Hussain's spouse, Nida Baweja ("Baweja") (collectively, the "Group") were involved in two prior similar businesses, beginning with the formation of a general partnership in approximately November of 2011. *See id.* [ECF No. 15 at 2]. Plaintiff states that the Group subsequently formed a Texas Corporation, OSArchitect, Inc., in order to provide many of the same services that Plaintiff offers today. *See id.* [ECF No. 15 at 2]. Plaintiff states that in approximately February of 2012, a new investor, Shahryar Gilani ("Gilani") joined the Group. *See id.* [ECF No. 15 at 2]. Plaintiff states that it is a Nevada Limited Liability Company

2

founded by Hussain and Defendant immediately after Gilani joined the Group. *See id.* [ECF No. 15 at 2]. Plaintiff states that at that time, it was also a software development company specializing in open source technology and architecture. *See id.* [ECF No. 15 at 2]. Today, Plaintiff states that it no longer develops software, but re-sells third-party enterprise-level software, and that this business model change was largely due to Defendant's wrongful actions. *See id.* [ECF No. 15 at 2-3].

Plaintiff states that it has developed a strong presence as an expert in "Open Source" technology, providing training and consulting services to a variety of clients. *See id.* [ECF No. 15 at 3]. Plaintiff contends that in July of 2008, Defendant purchased the domain, www.opensourcearchitect.com (the "Domain"). *See id.* [ECF No. 15 at 3]. Plaintiff states that the Domain did not have a website hosted until after Defendant began doing business with Hussain, who continues to be a principal of Plaintiff, along with Gilani and Baweja. *See id.* [ECF No. 15 at 3].

In approximately December of 2011, Plaintiff states that OSArchitect, Inc. developed a website to advertise and communicate with prospective and existing clients and that this website was live on the Domain in the early part of 2012. *See id.* [ECF No. 15 at 3]. Plaintiff contends that this website was largely developed by Defendant, in his capacity as Plaintiff's Founder and Vice President of Technology, and that Defendant acknowledged and acquiesced to Plaintiff's use and dominion over the Domain for this website. *See id.* [ECF No. 15 at 3]. Plaintiff contends that Defendant, on behalf of OSArchitect, Inc. and Plaintiff, established and actively began using e-mail addresses using this Domain beginning in approximately August of 2011, e.g., farhan@opensourcearchitect.com. *See id.* [ECF No. 15 at 3]. Plaintiff contends that Defendant acquiesced and acknowledged on numerous occasions that the registered Domain belonged to Plaintiff, along with other domains, including www.opensourcearchitect.org, and accepted the use

3

of the Domain in connection with Plaintiff's email accounts. *See id.* [ECF No. 15 at 3]. Plaintiff contends that Defendant cannot in good faith claim that the Domain does not rightfully belong to Plaintiff. *See id.* [ECF No. 15 at 3]. Thereafter, Plaintiff states that OSArchitect, Inc. transferred all of its rights to the website and the associated Domain to Plaintiff. *See id.* [ECF No. 15 at 3].

Plaintiff states that in approximately August of 2011, Defendant changed with the hosting company (Go Daddy, Inc.) the webmaster email address for the primary domain contact associated with Plaintiff's website to be: webmaster@opensourcearchitect.com. *See id.* [ECF No. 15 at 3]. Plaintiff further states that Defendant created OSArchitect, Inc.'s and Plaintiff's e-mails to be used by their respective employees. *See id.* [ECF No. 15 at 3-4]. Thereafter, Plaintiff states that its employees' and the Group's e-mail addresses used "opensourcearchitect.com." *See id.* [ECF No. 15 at 4].

Plaintiff contends that Defendant was responsible for the bookkeeping and accounting for the original General Partnership, OSArchitect, Inc. and Plaintiff (the "Entities"). *See id.* [ECF No. 15 at 4]. Plaintiff contends that it lost money, partly due to Defendant's continued accounting issues, which resulted from Defendant's lack of due care to Plaintiff. *See id.* [ECF No. 15 at 4]. Plaintiff states that accounts receivable, accounts payable, taxes, and expense reimbursements were behind, which caused Plaintiff damage. *See id.* [ECF No. 15 at 4].

Plaintiff states that on January 26, 2012, OSArchitect, Inc. filed an application with the United States Patent and Trademark Office ("USPTO") for the trademark registration of the service mark, "OPENSOURCEARCHITECT" (the "Mark"). *See id.* [ECF No. 15 at 4]. Plaintiff contends that Defendant was aware of the filing of the trademark application and never objected. *See id.* [ECF No. 15 at 4]. Plaintiff further contends that Defendant accepted without objection and acquiesced

4

to the ongoing use of and dominion over the Domain and the USPTO service mark registration. *See id.* [ECF No. 15 at 4].

On May 9, 2012, Plaintiff states that OSArchitect, Inc. filed an Assignment with the USPTO for the service mark "OPENSOURCEARCHITECT" to be assigned to Plaintiff, and that Defendant did not object to the filing of this assignment. *See id.* [ECF No. 15 at 4]. On approximately March 21, 2012, Plaintiff states that its founders, Hussain and Defendant ("Founders") were voted to become presenters at the Hadoop Summit held in San Jose, California during the first part of June in 2012. *See id.* [ECF No. 15 at 4]. Plaintiff states that this Summit represented the best opportunity for Plaintiff to gain valuable industry exposure for the new tool that it had been developing and marketing, the Rule 1 Analytics ("R 1 Analytics"). *See id.* [ECF No. 15 at 4]. Plaintiff contends that it invested a significant amount of resources to develop R 1 Analytics, and that the goal was for this presentation and demonstration of the R 1 Analytics to act as a springboard into "Big Data" software and product development. *See id.* [ECF No. 15 at 4]. Plaintiff states that Defendant agreed to give the presentation for the R 1 Analytics, and that Hussain agreed to give the presentation for a separate topic at the Red Hat Summit later in June. *See id.* [ECF No. 15 at 4-5]. Plaintiff states that it received a great deal of attention from industry leaders concerning Defendant's planned presentation, leading up to the Hadoop Summit. *See id.* [ECF No. 15 at 5].

Plaintiff states that in approximately April of 2012, Defendant's relatives urged Hussain to agree to bring in Defendant's sister's boyfriend, Tim Stokes, who volunteered to help initially without pay. *See id.* [ECF No. 15 at 5]. Plaintiff states that Defendant represented that he would cause additional investors to invest substantial funds into Plaintiff, such that Plaintiff could eventually afford to hire Tim Stokes to take over Defendant's bookkeeping and accounting duties

and also hire a web developer to help with the ongoing website development and maintenance. *See id.* [ECF No. 15 at 5].

Plaintiff states that on approximately June 11, 2012, just days before the presentation that Defendant had been working to complete for the R 1 Analytics tool, Defendant notified the Group and Gilani that he was not going to have time to complete his preparation for the presentation, and that Plaintiff should cancel the presentation. *See id.* [ECF No. 15 at 5]. Plaintiff states that the cancellation caused Plaintiff to be viewed in a negative light by some of Plaintiff's customers and prospective customers, including, but not limited to Hortonworks, Inc. *See id.* [ECF No. 15 at 5]. Plaintiff contends that significant resources and marketing activity were wasted, which left Plaintiff in a position where it was forced to abandon further development and marketing for the R 1 Analytics tool, as well as any further software development projects. *See id.* [ECF No. 15 at 5]. Plaintiff contends that around this time, Defendant revealed that the investors that he promised to produce were no longer going to invest in Plaintiff. *See id.* [ECF No. 15 at 5]. Plaintiff contends that it had relied upon Defendant's representations regarding the substantial contributions from these investors, which caused Plaintiff to incur a significant amount of debt after hiring a web developer and the prospective bookkeeper/accountant, Tim Stokes. *See id.* [ECF No. 15 at 5]. Plaintiff also contends that Tim Stokes demanded payment for the work he performed, despite his promise initially as Defendant's sister's boyfriend, to perform his duties without a fee. *See id.* [ECF No. 15 at 5]. Plaintiff contends that Defendant's acts and omissions caused Plaintiff significant damage. *See id.* [ECF No. 15 at 5].

Plaintiff contends that in June or early July of 2012, Defendant notified Plaintiff that he is leaving his position with Plaintiff, and that Friday, July 20, 2012 would be his last day. *See id.* [ECF

6

No. 15 at 6]. Plaintiff states that while Defendant was away on a business, on approximately July 17,

2012, Hussain changed the password for Defendant's e-mail associated with Plaintiff, but that

immediately thereafter, Defendant hacked into Plaintiff's e-mail account and e-mailed everyone at

opensourcearchitect.com a "Farewell" e-mail. *See id.* [ECF No. 15 at 5]. Plaintiff states that it

believes that on July 25, 2012, Defendant caused the contact information for the webmaster of the

Domain to be changed from webmaster@opensourcearchitect.com to webmaster@saadpatel.com.

*See id.* [ECF No. 15 at 6]. Plaintiff states that on July 26, 2012, the USPTO issued Registration No.

4166079 for the Mark, listing Plaintiff as the Owner. *See id.* [ECF No. 15 at 6]. Plaintiff contends

that many of its prospective clients' first contact with Plaintiff came as a result of Plaintiff's website

at the Domain, and that the website at the Domain was Plaintiff's primary source of marketing and

advertising. *See id.* [ECF No. 15 at 6]. Plaintiff states that the website at the Domain featured

Plaintiff's teaching materials, videos, technical write-ups, and tutorials, and that Plaintiff's videos

were also available via its channel on YouTube, which were tied to the Domain. *See id.* [ECF No.

15 at 6]. Plaintiff states that the e-mails referenced were e-mails using the Domain extension, and

the videos referenced the Domain for further information, which were no longer available or

accessible when Defendant "hi-jacked" the Domain. *See id.* [ECF No. 15 at 6].

Plaintiff contends that Defendant acquiesced to the transfer of all property used by the

Entities that was formerly owned by Defendant and/or Siddiqui, including the copyrights for

Plaintiff's existing software, all trademark rights (and goodwill appurtenant thereto), and the Domain

owned by Defendant and/or Siddiqui prior to the formation of Plaintiff. *See id.* [ECF No. 15 at 6].

Plaintiff contends that the Mark acquired secondary meaning or distinctiveness and goodwill due to

Plaintiff's continuous and exclusive use of the Mark in commerce since at least 2011. *See id.* [ECF

No. 15 at 7].

Plaintiff states that in approximately May of 2013 (approximately one-year after Defendant's departure), Plaintiff finished updating its website to include an interactive shopping cart for software products. *See id.* [ECF No. 15 at 7]. Plaintiff states that for security purposes and the sensitive nature of customer data, Plaintiff requires an SSL Certificate, but Defendant had control over the Domain as a result of his earlier change of the webmaster contact information, and Defendant would not cooperate in obtaining the necessary SSL Certificate for the newly revised website, despite Plaintiff's demands. *See id.* [ECF No. 15 at 7]. Plaintiff contends that Defendant's actions caused a delay in the launching of Plaintiff's newly revised website which costed Plaintiff prospective sales to new and existing clients. *See id.* [ECF No. 15 at 7].

Plaintiff states that prior to, and following Defendant's resignation, Plaintiff demanded on several occasions that Defendant transfer the Domain registration to reflect that Plaintiff is the registrant, but Defendant did not respond to these requests. *See id.* [ECF No. 15 at 7]. Plaintiff contends that Defendant fraudulently caused the Domain webmaster contact information to be changed to his personal e-mail address and refused to allow the owner of the Domain, Plaintiff, to access its Domain after Defendant acquiesced to Plaintiff's use of and dominion over the Domain. *See id.* [ECF No. 15 at 7]. Further, Plaintiff contends that it believes that Defendant has renewed the registration with Go Daddy, Inc. each year, in or around June, and that Defendant renewed the registration for a period of two years, until July of 2017, in an effort to continue to wrongfully hold the Domain or develop his own website on the Domain in the future. *See id.* [ECF No. 15 at 7].

Plaintiff contends that on May 4, 2013, Defendant caused Plaintiff's website to be unavailable from the .com Domain, where it had consistently been live for approximately two years,

which caused significant damage and disruption to Plaintiff's business. *See id.* [ECF No. 15 at 7]. Plaintiff contends that the fact that the Domain, which was known to be owned by Plaintiff, but no longer had a website, caused confusion among Plaintiff's customers, employees, and prospective customers, who attempted to visit Plaintiff's website at the Domain, which further tarnished and diluted Plaintiff's Mark. *See id.* [ECF No. 15 at 7-8]. Plaintiff contends that as a result of Defendant's unlawful conduct, all e-mail addresses for Plaintiff's employees were no longer able to receive incoming e-mails. *See id.* [ECF No. 15 at 8]. Plaintiff further contends that, although a large part of Plaintiff's business communications were conducted via e-mail, all clients, vendors, and contacts were no longer able to contact or communicate with Plaintiff via e-mail due to Defendant's conduct. *See id.* [ECF No. 15 at 8].

Plaintiff contends that during Defendant's employment with Plaintiff, he had access to Plaintiff's confidential information and trade secrets, namely, its client list, client contact information, accounting and marketing information, past history, and materials used by Plaintiff in connection with its seminars and lectures. *See id.* [ECF No. 15 at 8]. Plaintiff also states that Hussain caused Hortonworks, Inc. to become a customer of Plaintiff, and that Hortonworks, Inc. and Plaintiff had an existing, enforceable contract under which the parties had transacted business. *See id.* [ECF No. 15 at 8]. However, upon Defendant's departure, Plaintiff contends that Defendant began working for Hortonworks, Inc., after developing a relationship with Hortonworks, Inc. as an employee of Plaintiff. *See id.* [ECF No. 15 at 8]. Plaintiff states that it believes that Hortonworks, Inc. hired Defendant as an employee, and that since Defendant joined Hortonworks, Inc., Plaintiff was not given any projects by Hortonworks, Inc., and that it felt compelled to terminate the contract with Hortonworks, Inc. due to the lack of work. *See id.* [ECF No. 15 at 8]. Plaintiff contends that

Defendant's fiduciary breaches and fraudulent taking over of the Domain caused significant damage to Plaintiff. *See id.* [ECF No. 15 at 8].

## STANDARD OF REVIEW

The plaintiff bears the burden of establishing a prima facie case for the court's jurisdiction over a nonresident defendant on a motion to dismiss for lack of personal jurisdiction. *See Harries v. Stark*, No. 3:14-CV-2684-L, 2015 WL 4545071, at *2 (N.D. Tex. July 28, 2015) (citing *Ham v. La Cienega Music Co.*, 4 F.3d 413, 415 (5th Cir. 1993); *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985)). "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.* (citing *Stuart*, 772 F.2d at 1192). "The uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits should be resolved in favor of the plaintiff." *Id.* (citing *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990)). If the plaintiff makes its prima facie case, the burden shifts to the defendant to "present a compelling case that the presence of some other consideration would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985).

"A federal court has jurisdiction over a nonresident defendant if the state's long-arm statute confers personal jurisdiction over that defendant, and if the exercise of jurisdiction is consistent with due process under the United States Constitution." *See Harries*, 2015 WL 4545071, at *2 (citing *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 418 (5th Cir. 1993)). "Because the Texas long-arm statute extends to the limits of federal due process," the Court should determine if "(1) the defendants have established 'minimum contacts' with the forum state; and (2) whether the exercise of personal jurisdiction over the defendants would offend 'traditional notions of fair play

10

and substantial justice.'" *Id.* (citing *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990);

*Ruston Gas Turbines, Inc.*, 9 F.3d at 418; *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"The 'minimum contacts' prong is satisfied if a defendant 'purposefully avails itself of the

privilege of conducting activities within the forum state, thus invoking the benefits and protections

of its laws.'" *Id.* at *3 (quoting *Burger King*, 471 U.S. at 475). "The nonresident defendant's

availment must be such that the defendant 'should reasonably anticipate being haled into court' in

the forum state." *Id.* (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297

(1980)). "This test ensures that a defendant will not be haled into a jurisdiction solely as a result of

random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third

person." *Id.* (quoting *Burger King*, 471 U.S. at 475) (internal quotation marks omitted). "The

'minimum contacts' prong of the inquiry may be subdivided into contacts that give rise to 'specific'

personal jurisdiction and those that give rise to 'general' personal jurisdiction." *Id.* (citing *Marathon

Oil Co. v. A.G. Ruhrgas*, 182 F.3d 291, 295 (5th Cir. 1999)). "Specific jurisdiction is only

appropriate where the nonresident defendant's contacts with the forum state arise from, or are

directly related to, the cause of action." *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v.

Hall*, 466 U.S. 408, 414 n.8 (1984)). "The exercise of general personal jurisdiction is proper where

the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action,

are continuous, systematic, and substantial." *Id.* (citing *Hall*, 466 U.S. at 414 n.9).

In evaluating the second prong of the due process test, the court examines a number of factors

to determine fairness and reasonableness, including: (1) the defendant's burden; (2) the interests of

the forum state; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial

system's interest in efficiently resolving controversies; and (5) the state's interest in furthering social

policies. *Id.* (citing *Asahi Metals Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987)). "[O]nce minimum contacts are established, a defendant must present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.'" *Eviro Petroleum, Inc. v. Kondur Petroleum*, 79 F. Supp. 2d 720, 725 (S.D. Tex. 1999) (quoting *Burger King*, 471 U.S. at 277). "'Only in rare cases . . . will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state.'" *Id.* (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, PLC*, 815 S.W.2d 223, 231 (Tex. 1991)).

## ANALYSIS

In dismissing the Prior Lawsuit based on lack of personal jurisdiction, Judge O'Connor stated the following:

> In finding that this Court has personal jurisdiction over Defendant, the Court relied on Plaintiff's allegation that Defendant operated a directory-style website on Plaintiff's internet domain. When specific jurisdiction is based on a website, the Fifth Circuit follows the sliding scale adopted in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). *See Mink*, 190 F.3d at 336. *Zippo* requires the district court to assess the level of interactivity of the defendant's website and prescribes a separate course of action for each of three categories of websites: (1) where a website is nothing more than a passive advertisement, the court must decline to exercise personal jurisdiction; (2) where a website facilitates contractual relationships and the knowing and repeated transmission of computer files over the internet, personal jurisdiction is proper; and (3) where a website falls somewhere in between, "the exercise of jurisdiction is determined by the level of interactivity and commercial nature of the exchange of information that occurs on the website." *Id.* (citations omitted). In its Order, the Court found that "the internet website at issue [fell] under the second prong of *Zippo* because it facilitates contractual relationships and the knowing and repeated transmission of computer files over the internet." Order, Oct. 6, 2014, ECF No. 23. Thus, the Court found personal jurisdiction over Defendant.
>
> Plaintiff now concedes that the "domain appears to not have anything on it today." Pl.'s Resp. Mot. Recons. 3, ECF No. 50. Furthermore, it is possible that, when

Plaintiff's former counsel, Michael Cohen ("Cohen"), attempted to view the website domain at issue while drafting Plaintiff's Complaint, no such website existed and he was forwarded to his internet service provider's search engine website, and he confused the search engine website with Defendant operating a directory style website on Plaintiff's domain. *See* Pl.'s Resp. Mot. Sanctions 6, ECF No. 63. Nonetheless, the evidence no longer supports the original contention that Defendant has operated a directory-style website. Rather, it appears that the internet website at issue falls under the first prong of *Zippo*. Accordingly, the Court must decline to exercise personal jurisdiction over Defendant, and Defendant's Motion for Reconsideration is **GRANTED**.

Order [ECF No. 65 at 7-8; No. 3:13-CV-3755-O].

Defendant argues in its brief in support of its Motion to Dismiss Amended Complaint that while Judge O'Connor dismissed Plaintiff's Prior Lawsuit, because Defendant did not have the requisite contacts with Texas, Plaintiff's First Amended Complaint in this lawsuit alleges even fewer contacts than in the Prior Lawsuit. *See* Def.'s Br. [ECF No. 17 at 12-13]. Defendant argues that Plaintiff fails to allege that: (1) Defendant is a resident/citizen of Texas; (2) Defendant and Hussain formed a partnership under Texas law; (3) any Defendant/Hussain partnership first registered the Domain name; or (4) Defendant operated any website in connection with the Domain name. *See id.* [ECF No. 17 at 13]. Rather, Defendant argues that Plaintiff's First Amended Complaint alleges in a conclusory fashion that: (1) Defendant "aimed" unspecified tortious activities at Plaintiff; (2) Defendant was a part of a "group" of individuals that formed OSArchitect, Inc., a Texas Corporation; and (3) OSArchitect, Inc. transferred rights in the Domain name to Plaintiff. *See id.* [ECF No. 17 at 13]. Defendant argues that such allegations are even more devoid of facts than those previously considered and rejected by Judge O'Connor in the Prior Lawsuit and are insufficient to establish that Judge O'Connor was somehow previously mistaken, and the Court now has jurisdiction over Defendant. *See id.* [ECF No. 17 at 13].

13

Defendant further argues that Plaintiff improperly cites *Veracity Research Company v. Bateman*, No. 3:07-CV-2158-L, 2008 WL 2951910, at *5-6 (N.D. Tex. Aug. 1, 2008), for the broad proposition that "aiming" one or more tortious acts at a Texas "resident company" is sufficient to support a finding of specific jurisdiction over Defendant. *See* Def.'s Br. [ECF No. 17 at 13]. Defendant argues that *Bateman* involved the conduct that Plaintiff originally alleged in its Complaint in the Prior Lawsuit, but was subsequently required to admit was a false allegation. *See id.* [ECF No. 17 at 13]. Specifically, Defendant argues that *Bateman* involved a defendant whom, after leaving his employment, first registered a domain name that was nearly identical to that of his former Texas employer, and then actually operated a website using the domain name to divert business away from his former employer. *See id.* [ECF No. 17 at 13] (citing *Bateman*, 2008 WL 2951910, at *5-6). Defendant argues that Plaintiff cannot make such allegations here, and Plaintiff admits that Defendant registered the Domain name before Plaintiff and OSArchitect, Inc. came into existence, and Defendant has not used the Domain name since leaving Plaintiff's company. *See id.* [ECF No. 17 at 13-14]. Defendant further argues that while Plaintiff may feebly allege that Defendant's lack of operation of any website somehow constitutes trademark infringement, Defendant is not aware of any case law holding that a defendant's inaction is sufficient to establish the jurisdictional requirement. *See id.* [ECF No. 17 at 14].

Defendant argues that: (1) he is neither a resident or a citizen of Texas, but a resident and citizen of Illinois; (2) he has never resided or maintained a place of business in Texas; (3) he does not own, lease, possess, or maintain any real or personal property in Texas; (4) he has no bank accounts in Texas; and (5) he has no Texas driver's license or telephone number. *See id.* [ECF No. 17 at 14]. Defendant contends that his travels to Texas since acquiring the Domain name consists

14

of: (1) three trips to Plaintiff's Dallas office to attend meeting; (2) three trips to Texas in 2013 to conduct training sessions on behalf of Green Musk, LLC, an Illinois Limited Liability Company; and (3) three personal trips to Houston to visit extended family. *See id.* [ECF No. 17 at 14]. Defendant further contends that during his brief tenure as Plaintiff's employee, for a period of less than six months, Defendant worked out of his home in Illinois, not at Plaintiff's Nevada headquarters or Dallas office. *See id.* [ECF No. 17 at 16]; Def.'s Decl. [ECF No. 18 at 100]. Defendant argues that as Judge O'Connor already implicitly recognized, none of these contacts are sufficient to establish general or specific personal jurisdiction over Defendant in this forum. *See* Def.'s Br. [ECF No. 17 at 14]. Defendant argues that the required relationship between the defendant, the forum, and the litigation must arise out of contacts that the defendant created himself with the forum state, and a plaintiff cannot unilaterally create such contacts. *See id.* [ECF No. 17 at 16].

With respect to the general partnership allegedly formed by Defendant and a group of others, Defendant argues that the only relationship between this purported partnership with either Plaintiff or OSArchitect, Inc. pleaded by Plaintiff is that the partnership involved the same "group" of individuals that caused OSArchitect, Inc. to be formed. *See id.* [ECF No. 17 at 15]. Defendant further argues that Plaintiff has only pleaded bare legal conclusions, and not facts establishing that any such partnership was actually formed, and that such bare conclusions, devoid of any pleaded facts in support, should not be credited where they are expressly belied by Defendant's declaration. *See id.* [ECF No. 17 at 15].

Plaintiff argues in its response that it established in detail Defendant's wrongful activity aimed at Plaintiff, along with Defendant's everyday interactions and involvements on behalf of Plaintiff, as Plaintiff's co-founder. *See* Pl.'s Resp. [ECF No. 21 at 13]. Plaintiff contends that the

following allegations in its First Amended Complaint clearly explain Defendant's connection to

Texas by explaining his role with Plaintiff, whose principal place of business is in Dallas Texas:

**Paragraph 11**: In approximately December of 2011, OSArchitect, Inc. developed a website to advertise and communicate with prospective and existing clients and this website was live on the Domain in early 2012. This website was largely developed by Defendant as Plaintiff's Founder and Vice President of Technology, and Defendant acknowledged, accepted without objection, and acquiesced to Plaintiff's use and dominion over the Domain for this website. Defendant, on behalf of OSArchitect, Inc. and Plaintiff, established and actively began using e-mail addresses using this Domain in or around August of 2011, e.g., farhan@opensourcearchitect.com. Thus, Defendant acquiesced and acknowledged on numerous occasions that the registered Domain belonged to Plaintiff, along with other domains, including, www.opensourcearchitect.org; and acquiesced and accepted without objection to the use of the Domain in connection with Plaintiff's e-mail accounts.

**Paragraph 12:** In approximately August of 2011, Defendant changed the webmaster e-mail address used for the primary domain contact with the hosting company (GoDaddy) associated with Plaintiff's website to be: webmaster@opensourcearchitect.com. Defendant further created OSArchitect, Inc.'s and Plaintiff's e-mails to be used by their respective employees. Thereafter, Plaintiff's employees' and the Group's e-mail addresses used "opensourcearchitect.com."

**Paragraph 13:** Defendant was responsible for the bookkeeping and accounting for the original General Partnership, OSArchitect, Inc. and Plaintiff (the "Entities"). Plaintiff lost money, partly due to Defendant's continued accounting issues resulting from Defendant's lack of due care to Plaintiff. Plaintiff's accounts receivable, accounts payable, taxes, and expense reimbursements were behind, causing damage to Plaintiff.

**Paragraph 14:** On January 26, 2012, OSArchitect, Inc. filed an application with the United States Patent and Trademark Office ("USPTO") for the trademark registration of the service mark, "OPENSOURCEARCHITECT" (the "Mark"). Defendant was aware of the filing of the trademark application and never objected. Defendant further accepted without objection and acquiesced to the ongoing use of and dominion over the Domain and USPTO service mark registration.

**Paragraph 15:** On May 9, 2012, OSArchitect, Inc. filed an Assignment with the USPTO for the service mark, "OPENSOURCEARCHITECT" to be assigned to Plaintiff, and Defendant did not object to the filing of this assignment.

**Paragraph 16:** On approximately March 21, 2012, Plaintiff's Founders, Hussain and Defendant ("Founders") were voted to become presenters at the Hadoop Summit held in San Jose, California during the first part of June in 2012. This Summit represented the best opportunity for Plaintiff to gain valuable industry exposure for the new tool that it had been developing and marketing, the Rule 1 Analytics ("R 1 Analytics"). Plaintiff invested a significant amount of resources to develop R 1 Analytics, and the goal was for this presentation and demonstration of the R 1 Analytics to act as a

springboard into "Big Data" software and product development. Defendant agreed to give the presentation for the R 1 Analytics, and Hussain agreed to give the presentation for a separate topic at the Red Hat Summit later in June. Plaintiff received a great deal of attention from industry leaders concerning Defendant's planned presentation leading up to the Hadoop Summit.

**Paragraph 17:** While preparing for these presentations, the Founders continued to be responsible for their respective duties, but in approximately April of 2012, Defendant's relatives urged Hussain to agree to bring in Defendant's sister's boyfriend, Tim Stokes, who volunteered to help Defendant initially without pay. Defendant represented that he would cause additional investors to invest a substantial sum of money into Plaintiff, such that Plaintiff could afford to hire Tim Stokes to take over Defendant's bookkeeping and accounting duties and also hire a web developer to help with the ongoing website development and maintenance.

**Paragraph 18:** On approximately June 11, 2012, just days before the presentation that Defendant had been working to complete for the R 1 Analytics tool, Defendant notified the Group and Gilani that he was not going to have time to complete his preparation for the presentation and that Plaintiff should cancel the presentation. The cancellation was too late and caused Plaintiff to be viewed in a negative light by some of Plaintiff's customers and prospective customers, including, but not limited to Hortonworks, Inc. Significant resources and marketing activity were wasted and left Plaintiff in a position in which it was forced to abandon further development and marketing of the R 1 Analytics tool, as well as any further software development projects.

**Paragraph 19:** Around this time, Defendant revealed that the investors that he promised to produce were not going to invest in Plaintiff. Plaintiff relied upon Defendant's representations regarding the substantial contributions from these investors, which caused Plaintiff to incur a significant amount of debt after hiring a web developer and the prospective bookkeeper/accountant, Tim Stokes. Tim Stokes demanded payment for the work he performed, despite his promise initially, as Defendant's sister's boyfriend, to perform his duties without a fee. Defendant's actions and omissions caused Plaintiff significant damage.

**Paragraph 20:** In approximately June or early July of 2012, Defendant notified Plaintiff that he is leaving his position with Plaintiff and that Friday, July 20, 2012 would be his last day. While Defendant was away on a business, on approximately July 17, 2012, Hussain changed the password for Defendant's e-mail, but immediately thereafter, Defendant hacked into Plaintiff's e-mail account and e-mailed everyone at opensourcearchitect.com a "Farewell" e-mail.

**Paragraph 21:** On July 25, 2012, Defendant caused the contact information for the webmaster of the Domain to be changed from webmaster@opensourcearchitect.com to webmaster@saadpatel.com.

**Paragraph 22:** On July 26, 2012, the USPTO issued Registration No. 4166079 for the Mark, listing Plaintiff as the Owner.

**Paragraph 23:** Many of Plaintiff's prospective clients' first contact with Plaintiff came as a result of Plaintiff's website at the Domain, and the website at the Domain was Plaintiff's primary source of marketing and advertising. The website at the Domain featured Plaintiff's teaching materials, videos, technical write-ups, and tutorials, and Plaintiff's videos were also available via its channel on YouTube, which were tied to the Domain. The e-mails referenced were e-mails using the Domain extension, and the videos referenced the Domain for further information, which were no longer available or accessible when Defendant "hi-jacked" the Domain.

**Paragraph 24:** Defendant accepted without objection and acquiesced to the transfer of all property used by the Entities that was formerly owned by Defendant and/or Siddiqui, including the copyrights for Plaintiff's existing software, all trademark rights (and goodwill appurtenant thereto), and the Domain owned by Defendant and/or Siddiqui prior to the formation of Plaintiff.

**Paragraph 25:** The Mark has acquired secondary meaning or distinctiveness and goodwill due to Plaintiff's continuous and exclusive use of the Mark in commerce since at least 2011.

**Paragraph 26:** In approximately May of 2013 (approximately one year after Defendant's departure), Plaintiff finished updating its website to include an interactive shopping cart for software products. For security purposes and the sensitive nature of customer data, Plaintiff requires an SSL Certificate, but Defendant had control over the Domain as a result of his earlier change of the webmaster contact information, and Defendant would not cooperate in obtaining the necessary SSL Certificate for the newly revised website, despite Plaintiff's demands. Defendant's actions caused a delay in the launching of Plaintiff's newly revised website which costed Plaintiff prospective sales to new and existing clients.

**Paragraph 27:** Prior to and following Defendant's resignation, Plaintiff demanded on several occasions that Defendant transfer the Domain registration to show Plaintiff as the registrant, but Defendant did not respond to these requests. Defendant fraudulently caused the Domain webmaster contact information to be changed to his personal e-mail address and refused to allow the owner of the Domain, Plaintiff, to access its Domain. Further, Plaintiff believes that Defendant has renewed the registration with Go Daddy, Inc. each year in or around June, and that Defendant renewed the registration for a period of two (2) years, until July of 2017, in an effort to continue to wrongfully hold the Domain hostage or develop his own website on the Domain in the future.

**Paragraph 28:** On May 4, 2013, Defendant caused Plaintiff's website to be unavailable from the .com Domain, where it had consistently been live for approximately two years, which caused significant damage and disruption to Plaintiff's business. The fact that the Domain, which was known to be owned by Plaintiff, but no longer had a website, caused confusion among Plaintiff's customers, employees, and prospective customers who attempted to visit Plaintiff's website at the Domain, which further tarnished and diluted Plaintiff's Mark.

**Paragraph 29:** As a result of Defendant's unlawful conduct, all e-mail addresses for Plaintiff's employees were no longer able to receive incoming e-mails. Although a large part of Plaintiff's

business communications were conducted via e-mail, all clients, vendors, and contacts were no longer able to contact or communicate with Plaintiff via e-mail.

**Paragraph 30:** During Defendant's employment with Plaintiff, he had access to Plaintiff's confidential information and trade secrets, namely, its client list, client contact information, accounting and marketing information, past history, and materials used by Plaintiff in connection with its seminars and lectures.

**Paragraph 31:** Hussain caused Hortonworks, Inc. to become a customer of Plaintiff, and Hortonworks,Inc. and Plaintiff had an existing enforceable contract under which the parties had transacted business. However, upon Defendant's departure, Defendant began working for Hortonworks, Inc. after developing a relationship with Hortonworks, Inc. as an employee of Plaintiff. Plaintiff believes that Hortonworks, Inc. hired Defendant as an employee, rather than an independent contractor, and since Defendant joined Hortonworks, Inc., Plaintiff was not tasked to work on any projects with Hortonworks, Inc. Plaintiff felt compelled to terminate the contract with Hortonworks, Inc. due to the lack of work.

Pl.'s Resp. [ECF No. 21 at 13-16]; Am. Compl. [ECF No. 15 at 3-8].

With respect to Defendant's argument that *Bateman*, 2008 WL 2951910, at *5-6 is distinguishable from the instant case, Plaintiff argues that Defendant fails to address the fact that Defendant "hi-jacked" the Domain and also took Plaintiff's e-mails that contained the Domain and video references. *See* Resp. [ECF No. 21 at 16-17]. Plaintiff also argues that, upon information and belief, Defendant used the e-mails in commerce by causing them to be re-directed to his e-mail. *See id.* [ECF No. 21 at 17]. Plaintiff argues that the alleged torts are all aimed at Plaintiff who has a principal place of business in Dallas, Texas. *See id.* [ECF No. 21 at 17]. Plaintiff therefore argues that the holding in *Bateman* supports the proposition that at least specific personal jurisdiction exists over Defendant, because Defendant aimed torts at a Texas company, damaged it in Texas, caused confusion among individuals and companies attempting to contact Plaintiff, and shut down a website that was present at the Domain. *See id.* [ECF No. 21 at 17].

Plaintiff further argues that while Defendant may not have signed any agreements, he caused

his wife to invest in Plaintiff through a written agreement and further caused his sisters to invest in Plaintiff. *See id.* [ECF No. 21 at 18]. Plaintiff argues that the fact Defendant secured investments for Plaintiff, managed bank accounts, developed the website that he later "hi-jacked," created the e-mail addresses that he also later "hi-jacked," held himself out as a co-founder, and acted consistently with holding such a title, along with his extensive tortious activities clearly aimed at Plaintiff, a company with its principal place of business in Texas, must be sufficient to establish that Defendant could reasonably have anticipated being haled into court in Texas and purposefully availed himself of the privileges of conducting business in Texas. *See id.* [ECF No. 21 at 18].

In his Reply, Defendant argues that Plaintiff's allegations need only be taken as true to the extent that they are not contradicted by Defendant's affidavit. *See* Reply [ECF No. 23 at 2] (citing *Wyatt v. Kaplan*, 686 F.2d 276, 282-83 n.13 (5th Cir. 1982)). Defendant argues that he submitted an affidavit establishing that, as Judge O'Connor already found, he has not had contacts with Texas sufficient to establish personal jurisdiction. *See id.* [ECF No. 23 at 2]. Defendant argues that Plaintiff filed an affidavit that fails to contradict the facts established in Defendant's affidavit, but rather only: (1) attempts to counter Defendant's claim that Plaintiff is judge shopping by asserting that Plaintiff was purportedly unaware that Judge O'Connor relocated to Fort Worth; and (2) attempts to authenticate a single e-mail relating to negotiations for a potential private sale of a third-party's shares in Plaintiff, a transaction to which Defendant was not a party and had nothing to do with his contacts to Texas. *See id.* [ECF No. 23 at 2]. Therefore, Defendant argues that the Court has before it to consider in connection with the jurisdictional issue: (1) Defendant's declaration, and (2) to the extent that they are not conclusory or contradicted by Defendant's declaration, the remaining allegations in Plaintiff's First Amended Complaint. *See id.* [ECF No. 23 at 2].

20

Defendant contends that his declaration establishes that: (1) he was never an owner, shareholder, member, or director of Plaintiff; and (2) his job title during the time he was briefly employed with Plaintiff was "Lead Open Source Architect." *See id.* [ECF No. 23 at 2]; Def.'s Decl. [ECF No. 18 at 100]. Defendant argues that while Plaintiff's response includes an e-mail relating to negotiations concerning a third-party's sale of shares in Plaintiff, Plaintiff does not and cannot allege that Defendant owned the shares at issue. *See* Reply [ECF No. 23 at 2]. Moreover, Defendant argues that while Plaintiff refers to Defendant as purportedly being one of a group who "founded" Plaintiff, Plaintiff cites no authority for the proposition that being an Illinois based "founding" employee of a Nevada Limited Liability Company which has a Dallas office is sufficient to create personal jurisdiction over Defendant in Texas. *See id.* [ECF No. 23 at 2-3]. Defendant argues that his declaration further establishes that he made no use of the Domain name since Plaintiff ceased to permit its continued use, and expressly states that Defendant has not associated the Domain name with any websites or e-mail addresses. *See id.* [ECF No. 23 at 3]; Def.'s Decl. [ECF No. 18 at 101]. Defendant argues that his declaration entirely refutes the unsupported argument that he purportedly "hi-jacked" or diverted any of Plaintiff's e-mails or that Plaintiff's e-mails were purportedly forwarded to him. *See* Reply [ECF No. 23 at 3].

Defendant further argues that Plaintiff's response to his Motion to Dismiss Amended Complaint ignores two requirements for establishing a prima facie case of personal jurisdiction over Defendant: (1) that it is Plaintiff's burden to establish that Defendant committed a tort in Texas; and (2) the Fifth Circuit requires a plaintiff bringing multiple claims that arise out of different purported forum contacts to separately establish the specific jurisdiction for each claim. *See id.* [ECF No. 23 at 3] (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006)). Defendant

argues that rather than attempting to meet either of these two requirements, Plaintiff instead verbatim copies 23 paragraphs of its First Amended Complaint into its response, without providing any discourse as to why those paragraphs include facts sufficient to establish that Judge O'Connor got it wrong in the Prior Lawsuit. *See id.* [ECF No. 23 at 3]. Defendant argues that, he on the other hand, demonstrated in the Prior Lawsuit and in his opening brief in this lawsuit specifically why the allegations of those paragraphs do not establish personal jurisdiction. *See id.* [ECF No. 23 at 3-4].

Upon consideration of the foregoing, the undersigned concludes that Plaintiff failed to meet its burden of demonstrating personal jurisdiction over Defendant. As previously discussed, Plaintiff bears the burden of establishing a prima facie case for the Court's jurisdiction over a nonresident defendant on a motion to dismiss for lack of personal jurisdiction. *See Harries*, 2015 WL 4545071, at *2 (citing *Ham*, 4 F.3d at 415; *Stuart*, 772 F.2d at 1192). Further, as Defendant points out, the Fifth Circuit requires a plaintiff bringing multiple claims that arise out of a nonresident defendant's different purported forum contacts to separately establish the specific jurisdiction for each claim. *See id.* [ECF No. 23 at 3] (citing *Seiferth*, 472 F.3d at 275). Plaintiff concedes in its response that Defendant's "visits [to Texas] alone may not be sufficient to confer [general] personal jurisdiction," but argues that "the totality of the evidence here is sufficient to establish that this Court has specific personal jurisdiction over [Defendant]." *See* Resp. [ECF No. 21 at 17]. However, as Defendant further points out, Plaintiff merely copies and pastes paragraphs 11 through 31 from its First Amended Complaint into its response to Defendant's Motion to Dismiss Amended Complaint, without specifically explaining which forum contacts alleged in those 21 paragraphs establish specific personal jurisdiction for each of his eight claims for (1) Cybersquatting, (2) Conversion, (3) Tortious Interference with Contract and Business Relationships, (4) Breach of Fiduciary Duty of

Loyalty and Care, (5) Federal Mark Infringement, (6) False Designations of Origin, False Descriptions, False Representations, and Unfair Competition, (7) Common Law Trademark Infringement, and (8) Common Law Unfair Competition. *See id.* [ECF No. 21 at 13-18]; Am. Compl. [ECF 15 at 8-14]. In *Seiferth v. Helicopteros Atuneros, Inc.*, the Fifth Circuit explained as follows:

> A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim. This result flows logically from the distinction between general and specific jurisdiction and is confirmed by the decisions of our sister circuits. If a defendant does not have enough contacts to justify the exercise of general jurisdiction, the Due Process Clause prohibits the exercise of jurisdiction over any claim that does not arise out of or result from the defendant's forum contacts. Permitting the legitimate exercise of specific jurisdiction over one claim to justify the exercise of specific jurisdiction over a different claim that does not arise out of or relate to the defendant's forum contacts would violate the Due Process Clause. Thus, if a plaintiff's claims relate to different forum contacts of the defendant, specific jurisdiction must be established for each claim.

*Seiferth*, 472 F.3d at 274-75 (citations omitted). Plaintiff failed to establish here the specific personal jurisdiction for each of his eight alleged claims as required.

Further, as alluded to by Defendant, while Plaintiff makes some factual allegations in its First Amended Complaint in this lawsuit that are different from those made in the Original Complaint in the Prior Lawsuit, Plaintiff alleges conduct in this lawsuit that is very similar to the conduct that Judge O'Connor had before him when he dismissed the Prior Lawsuit for lack of personal jurisdiction. *See* Am. Compl. [ECF No. 15 at 2-8]; Compl. [ECF 1 at 4-5; No. 3:13-CV-3755-O]. In its response to Defendant's Motion to Dismiss Amended Complaint, Plaintiff argues that its allegations such as that Defendant interfered with its employees' e-mails so as to cause confusion among its clients, that Defendant "hi-jacked" the Domain, and that Defendant managed Plaintiff's

bank accounts, are sufficient to establish that Defendant purposefully availed himself of the privileges of conducting business in Texas. *See* Resp. [ECF No. 21 at 17-18]. However, in the Prior Lawsuit, Plaintiff similarly alleged in its Original Complaint that Defendant caused damage to Plaintiff's business by: (1) causing all of Plaintiff's employees' e-mails to cease working; (2) causing the Domain to no longer point to Plaintiff's website; (3) actively pursuing Plaintiff's clients by using confidential information acquired during Defendant's employment with Plaintiff and taking business away from Plaintiff; and (4) misappropriating Plaintiff's company funds from payroll. *See* Compl. [ECF No. 1 at 4-5; No. 3:13-CV-3755-O]. Plaintiff titles paragraphs 25 through 34 of its Original Complaint in the Prior Lawsuit as "Defendant's Unlawful Actions." *See id.* [ECF No. 1 at 4-5; No. 3:13-CV-3755-O]. Paragraphs 25 through 34 of Plaintiff's Original Complaint in the Prior Lawsuit state the following:

**Paragraph 25:** The Open Source Predecessor registered www.opensourcearchitect.com (the "Domain") on July 7, 2008.

**Paragraph 26:** Currently, Defendant is the sole registrant of the Domain.

**Paragraph 27:** Prior to and following Defendant's resignation from Plaintiff, Plaintiff demanded on several occasions that Defendant transfer the Domain to Plaintiff as the registrant. Defendant refused to transfer the Domain on each occasion.

**Paragraph 28:** On May 3, 2013, Defendant sent a reply letter to Plaintiff's demand to transfer the Domain. In this letter, Defendant again refused to transfer the Domain to Plaintiff and further stated that within 24 hours, the Domain "will no longer point to your client's website."

**Paragraph 29:** On May 4, 2013, Defendant did in fact cause the Domain to no longer point at Plaintiff's website which has consistently pointed at the domain, causing tremendous damage and disruption to Plaintiff's business.

**Paragraph 30:** As a result of Defendant's unlawful conduct, each and every single e-mail address of every employee of Plaintiff was no longer operational. Any and all clients, vendors, and contacts were no longer able to contact or communicate with the Plaintiff via e-mail as a result of Defendant's unlawful conduct.

**Paragraph 31:** During Defendant's work and employment with Plaintiff, he had access to confidential information and trade secrets belonging to Plaintiff, namely, its client list, client contact information, accounting, marketing information, past history, and materials used by Plaintiff in connection with its seminars and lectures.

**Paragraph 32:** On information and belief, immediately following Defendant's departure from Plaintiff, Defendant began an active campaign to court Plaintiff's clients with the intent to solicit business.

**Paragraph 33:** On information belief, one such existing client of Plaintiff, Hortonworks, Inc. retained Defendant to perform the same work that Plaintiff previously performed for it. Plaintiff has since not received any work from Hortonworks, Inc. as a result of Defendant's actions.

**Paragraph 34:** In addition to Defendant's breaches set forth above, Defendant misappropriated Plaintiff's company funds from payroll to a pay a nonemployee.

*See id.* [ECF No. 1 at 4-5; No. 3:13-CV-3755-O]. Given that the conduct alleged in Plaintiff's First Amended Complaint in this lawsuit is very similar to the conduct that was before Judge O'Connor in the Prior Lawsuit, conduct which was deemed insufficient to find personal jurisdiction, a similar finding appears to be warranted here.

Plaintiff asks the Court for leave to file its Second Amended Complaint. *See* Resp. [ECF No. 21 at 29]. The Court ordinarily allows a plaintiff to amend its complaint in an attempt to cure the defects identified by the defendant. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). Here, Plaintiff has already filed an amended complaint in this case. Further, because this case is a re-filing of the Prior Lawsuit previously dismissed without prejudice by Judge O'Connor in *Open Source Group, LLC v. Patel*, No. 3:13-CV-3755-O, Plaintiff was made aware of the pleading deficiencies at the time of that dismissal. Therefore, because Plaintiff has had

ample opportunities to cure the deficiencies that Plaintiff has been apprised of by Defendant, and because Plaintiff is not proceeding *pro se*, but has been represented by counsel in both lawsuits, the undersigned recommends that the District Court deny Plaintiff's request for leave to file its Second Amended Complaint.

In sum, because Plaintiff failed to meet its burden of establishing a prima facie case for the District Court's jurisdiction over Defendant, the undersigned recommends that the District Court grant Defendant's Motion to Dismiss Amended Complaint.[1]

## **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the District Court **DENY as moot** Defendant's Motion to Dismiss Complaint [ECF No. 10], and **GRANT** Defendant's Motion to Dismiss Amended Complaint [ECF No. 16].

**SO RECOMMENDED**, this ___ day of _____ 2016.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

---

1. Because the undersigned determines that Defendant's Motion to Dismiss Amended Complaint should be granted based on lack of personal jurisdiction, the undersigned pretermits consideration of Defendant's remaining arguments for dismissal.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within fourteen days after service of the findings, conclusions, and recommendation. A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory, or general objections. A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within fourteen days after service shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).